IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01337-PAB-KAS

KRISTEN GRAESSER,

   Plaintiff,

v.

IQVIA RDS INC., a North Carolina corporation,

   Defendant.

_____

**ORDER**
_____

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 54] filed by defendant IQVIA RDS Inc. ("IQVIA") on September 30, 2022 and plaintiff Kristen Graesser's Unopposed Motion Seeking Leave to File Sur-reply [Docket No. 72].[1]  The Court has jurisdiction pursuant to 28 U.S.C. § 1332.  This dispute concerns whether Graesser should have been paid a bonus that Graesser alleges she earned in 2020 working for IQVIA.

# I. BACKGROUND

## A. Undisputed Facts[2]

IQVIA is a multi-national pharmaceutical company headquartered in North Carolina.

---

[1] Plaintiff's motion for leave to file a sur-reply requests an opportunity to address a case, *Cahey v. Int'l Bus. Machines Corp.* (*Cahey II*), No. 20-cv-00781-NYW, 2021 WL 5384526, at *12 (D. Colo. Nov. 18, 2021), that was decided after she filed her response, but before defendant filed its reply.  Docket No. 72 at 1-2, ¶¶ 2-4.  The motion is unopposed.  *Id.* at 2, ¶ 6.  The Court will grant Graesser's motion and consider her sur-reply.

[2] The following facts are undisputed unless otherwise indicated.

Docket No. 54 at 2, ¶¶ 1-2.  In 2020, Sebastian Antonelli acted as the Regional Manager of IQVIA's American Central Nervous System ("CNS") medical team.  *Id.*, ¶ 4.  IQVIA employed Graesser as an Associate Medical Director ("AMD") on the American CNS medical team from May 6, 2019 until January 22, 2021.[3]  *Id.* at 3, 7, 13, ¶¶ 5-6, 20, 45.  AMDs report to Regional Managers, and Graesser reported to Antonelli.  *Id.* at 3, ¶¶ 5-6.

IQVIA provides AMDs with salary-based pay.  *Id.*, ¶ 7.  IQVIA also has a non-salary compensation program called the Annual Incentive Plan ("AIP").  *Id.*  IQVIA's AIP sets a baseline amount that an employee may be eligible to earn as a bonus.  *Id.*, ¶ 9.

IQVIA provided an offer letter to Graesser that stated:

> You may participate in non-salary compensation programs as may be available, including an annual cash incentive plan which may be made available to company employees; subject to applicable terms, conditions and eligibility requirements of these plans and at the plan administrator's discretion.  Your bonus target for the plan currently in effect will be 15%.  This bonus is earned and awarded at the end of the first quarter of the following year, if the participant is employed in good standing at the time of payment.  Incentive payout is prorated based on start date and time worked.  Your start date must occur on or before September 30 to be eligible to participate in an incentive plan for the year.

*Id.* at 7, ¶ 21; Docket No. 65-5 at 2.[4]  On March 13, 2020, Graesser was awarded

---

[3] Graesser neither admits nor denies her start date or end date at IQVIA.  *See* Docket No. 65 at 5, 10, ¶¶ 20, 45.  The Court will deem these facts admitted.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact" the court may, "consider the fact undisputed for purposes of the motion."); Practice Standards (Civil case), Chief Judge Philip A. Brimmer, § III.F.3.b.ix. (noting that a failure to properly admit or deny facts "may cause the Court to deem certain facts as admitted").

[4] Graesser attaches the entire offer letter to her response at Docket No. 65-5.  IQVIA provides the entire letter at Docket No. 71-1.

a bonus of $12,597.14 for the 2019 AIP year.  Docket No. 54 at 8, ¶ 24.

The AIP is defined by IQVIA's "AIP Rules Document."  *Id.* at 4, ¶ 11.  There is no evidence Graesser was provided with the AIP Rules Document.  Docket No. 65 at 11, ¶ 2.[5]  The AIP allows for discretionary bonuses that are not guaranteed.  Docket No. 54 at 4, ¶ 12.[6]  The AIP Rules Document states that "IQVIA reserves the right to adjust (including by reduction to zero) an individual's payment hereunder at any time and for any reason."  *Id.*, ¶ 13 (quoting Docket No. 54-6 at 7).[7]

Each global medical team management group can set parameters regarding the employees that may be eligible for bonuses, such as allowing employees that

---

[5] IQVIA does not cite undisputed evidence that Graesser was provided with the AIP Rules Document or made aware that it existed other than the reference to "plans" in her offer letter.  IQVIA states that candidates and new employees may discuss "the details of IQVIA's AIP with recruiters" and with IQVIA's benefits and compensation departments.  Docket No. 54 at 4, ¶ 10.  In support, IQVIA cites declarations from Matthew McKeever, an employee at IQVIA, and Sebastian Antonelli that "IQVIA's AIP Plan Rules Document . . . is easily accessible to employees at all times on IQVIA's intranet and a link for which is sent via email to every employee each year."  Docket No. 54-1 at 2, ¶ 8; Docket No. 54-2 at 2, ¶ 5.  IQVIA also states that the AIP Plan Rules Document is emailed to every employee each year and is easily accessible to employees.  Docket No. 54 at 4, ¶ 11.  In support, IQVIA cites an email that IQVIA sent to employees that is dated April 1, 2021, after Graesser resigned, describing the AIP.  Docket No. 54-7 at 1.  None of IQVIA's undisputed statements of fact or cited evidence suggests anyone informed Graesser of the AIP Rules Plan Document before her resignation.  The Court will deem this fact admitted.

[6] Graesser denies this fact because "Defendant's references to that document as 'AIP Plan Rules Document' and implications that Exhibit F established the terms or conditions of any agreement between the Parties are patent mischaracterizations."  Docket No. 65 at 4, ¶ 12.  This is not responsive to IQVIA's statement of fact.  The Court will deem this fact admitted.  *See* Fed. R. Civ. P. 56(e)(2); Practice Standards (Civil case), Chief Judge Philip A. Brimmer, § III.F.3.b.ix.

[7] Graesser denies this fact because "Exhibit F was not part of any agreement that existed between the Parties."  Docket No. 65 at 4, ¶ 13.  This is not responsive to IQVIA's statement of fact.  The Court will deem this fact admitted.

received a high enough score on their annual performance review to be eligible for a potential bonus under the AIP.  *Id.* at 6-7, ¶ 18.[8]  The CNS management team decided that any employee who received an overall 2020 annual performance rating of 4 or 5, the lowest on a 5 point scale, would not be eligible for a bonus under the AIP for that year.  *Id.* at 7, ¶ 19.[9]

On December 30, 2020, Antonelli gave Graesser an overall rating of 4, "Below Expectations," on her 2020 annual performance review.  *Id.* at 12, ¶ 44.[10]  Graesser voluntarily resigned from her position at IQVIA on January 4, 2021.  *Id.*

---

[8] Graesser denies this fact stating that "[t]here is no evidence supporting the allegation[s]" in IQVIA's statement of fact.  Docket No. 65 at 5, ¶ 18.  IQVIA cites Matthew McKeever's declaration which states: "[e]ach global medical team management group can, and with senior business approval generally does, set parameters regarding the employees that may be eligible for bonuses in the first place, such as only allowing employees that received a high enough score on their annual performance review to be eligible for a potential bonus under the AIP."  Docket No. 54-1 at 3, ¶ 11.  The Court finds that IQVIA has cited evidence supporting this fact.  Thus, the Court will deem this fact admitted.

[9] Graesser denies this fact because it was not communicated to her.  Docket No. 65 at 5, ¶ 19.  This does not raise any material factual dispute, and the Court will deem this fact admitted.

[10] Graesser denies this fact.  Docket No. 65 at 10, ¶ 44.  She states, "[i]n January 2020, Antonelli told Graesser that she had gone 'above and beyond' and that her performance had exceeded expectations," alleges IQVIA altered her performance review after litigation began, and denies the performance review in the record "reflects a true and good faith rating by her former supervisor."  *Id.*  In support, she cites her deposition.  *Id.*  In her deposition, Graesser testified that, in January 2021, Antonelli said that "overall he felt that [Graesser's] performance was exceeding expectations."  Docket No. 65-4 at 74, 157:17-19.  Graesser provides no evidence, through her testimony or otherwise, that she did not receive a rating of below expectations in her performance review in December 2020.  Without any evidence from Graesser that her annual review, as opposed to a comment by a supervisor, did not provide an overall evaluation of below expectations, Graesser's allegation of IQVIA altering evidence is insufficient to create a genuine dispute of material fact.

4

at 13, ¶ 45.[11]

## B. Procedural Background

Graesser's complaint alleges that IQVIA violated the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 to -124 ("CWCA"), by withholding the bonus she earned in 2020. Docket No. 1 at 6-7, ¶¶ 31-40. She alleges that she was supposed to receive a bonus each year as long as she met her goals, her division met its goals, and IQVIA "earned Incentive Plan payments." *Id.* at 4, ¶ 17. Graesser alleges all three of those metrics were met in 2020 and that she therefore earned a bonus, but that IQVIA did not provide one to her. *Id.* at 5, ¶ 25. In the alternative, Graesser alleges that she is owed a bonus by IQVIA under the doctrine of promissory estoppel. *Id.* at 7-8, ¶¶ 41-46. She alleges IQVIA promised to give her a bonus, based in part on her meeting her annual goals, that IQVIA should have known Graesser would be induced to rely on IQVIA's promise, that Graesser relied on IQVIA's promise by meeting her goals, and that IQVIA breached its promise to Graesser by failing to pay her a bonus. *Id.* IQVIA moves for summary judgment on Graesser's CWCA and promissory estoppel claims. Docket No. 54 at 1.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v.*

---

[11] Graesser neither admits nor denies this statement of fact. *See* Docket No. 65 at 10, ¶ 45. The Court will deem it admitted. *See* Fed. R. Civ. P. 56(e)(2); Practice Standards (Civil case), Chief Judge Philip A. Brimmer, § III.F.3.b.ix.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The non-moving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

### III.  ANALYSIS

#### A.  Colorado Wage Claim Act

The CWCA states that, "[w]hen an employee quits or resigns such employee's employment, the wages or compensation shall become due and payable upon the next regular payday."  Colo. Rev. Stat. § 8-4-109(1)(b).  The CWCA defines "wages or compensation" as:

> (I) All amounts for labor or service performed by employees, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculating the same or whether the labor or service is performed under contract, subcontract, partnership, subpartnership, station plan, or other agreement for the performance of labor or service if the labor or service to be paid for is performed personally by the person demanding payment.  *No amount is considered to be wages or compensation until such amount is earned, vested, and determinable, at which time such amount shall be payable to the employee pursuant to this article*.
>
> (II) *Bonuses or commissions earned for labor or services performed in accordance with the terms of any agreement between an employer and employee*.

Colo. Rev. Stat. § 8-4-101(14)(a) (emphasis added).  Furthermore, "[n]othing in [Colo. Rev. Stat. § 8-4-109(1)] shall . . . require the payment at the time employment is severed of compensation not yet fully earned under the compensation agreement between the employee and employer, whether written or oral."  Colo. Rev. Stat. § 8-4-109(2).  The CWCA "does not itself create any substantive right to compensation for labor and services performed.  Rather, it establishes minimal requirements concerning when and how agreed compensation must be paid and provides remedies and penalties for an employer's noncompliance with those requirements."  *Kirkland v. Robert W. Baird & Co.*, No. 18-cv-0274-MSK-SKC, 2020 WL 1452165, at *7 (D. Colo. Mar. 25, 2020)

(quoting *Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 210 (Colo. App. 1990)).  In order to obtain summary judgment, IQVIA must show it is undisputed that Graesser was not entitled to a bonus that was earned, vested, and determinable pursuant to an agreement between the parties at the time she left IQVIA.

### 1.  The Parties' Agreement

First, the Court must determine what constitutes the compensation agreement between IQVIA and Graesser.  The CWCA does not define an employment agreement.  In the definition of wages, the CWCA lists amounts provided for labor or services performed under "contract, subcontract, partnership, subpartnership, station plan, or other agreement," Colo. Rev. Stat. § 8-4-101(14)(a)(I), and in the provision on payments required at the termination of employment, the CWCA references "compensation agreement[s]," acknowledging they can be written or oral.  *Id.* § 8-4-109(2).

The parties do not explicitly state what constitutes the parties' compensation agreement.  IQVIA cites the offer letter and the AIP Rules Document as part of the parties' agreement.  Docket No. 54 at 15-16.  Graesser responds that the AIP Rules Document is not the parties' entire agreement and that "the evidence establishes that the agreement between the parties was almost entirely informal and oral."  Docket No. 65 at 14-16.  IQVIA replies that Graesser incorrectly argues the AIP Rules Document did not apply to her.  Docket No. 71 at 9.

Both parties cite Graesser's offer letter as part of the agreement between the parties.  *See* Docket No. 54 at 15-16; Docket No. 65 at 2-3, 16, ¶ 7.  The Court will therefore assume that her offer letter is part of her compensation agreement.

IQVIA argues that the terms of the AIP, as stated in the AIP Rules Document, are part of the parties' employment agreement. Docket No. 54 at 15-16. Graesser argues that the AIP Rules Document is not the parties' entire employment agreement for six reasons: (1) IQVIA made inconsistent arguments on whether the AIP Rules Document contained the parties' entire agreement in filings in this case, (2) Antonelli admitted he was unaware of the document, (3) the AIP Rules Document does not meet the requirements for an employer handbook to have binding effect, (4) Graesser never saw, knew of, or agreed to the language in the AIP Rules Document, (5) the AIP Rules Document is not signed and therefore it is not enforceable, and (6) the parties' agreement was "almost entirely oral and unenforceable." *Id.* at 15-16. Defendant responds that it is not material whether Graesser knew about the AIP Rules Document to determine whether it applied to her.

The CWCA recognizes that compensation agreements can include things other than employment contracts. Colo. Rev. Stat. § 8-4-101(14)(a); *see, e.g., Kirkland v. Robert W. Baird & Co., Inc.*, No. 18-cv-02724-MSK-SKC, 2020 WL 1452165, at *8 (D. Colo. March 25, 2020) ("In order to establish a violation of the CWCA, [plaintiff] must show he was owed commissions that were earned, vested, and determinable under the terms of the Offer and the parties' course of conduct."). In determining whether a bonus consists of wages due under the CWCA, a court may analyze written contracts, employer materials, and oral agreements.[12] "The only limitation the General Assembly placed on

---

[12] *See, e.g., Johnson v. Greenfield Holdings, LLC*, No. 22-cv-01909-REB-NRN, 2023 WL 3437372, at *3 (D. Colo. May 12, 2023) (written contract); *Lawson v. Heartland Payment Systems, LLC*, 548 F. Supp. 3d 1085, 1092 (D. Colo. 2020) (company sales policy); *Richter v. Wells Fargo Bank, N.A.*, No. 19-cv-01232-LTB, 2019 WL 4736465, at

the types of wages or compensation to be received at termination was that they must be 'earned, vested, determinable, and unpaid.'" *Hernandez v. Ray Domenico Farms, Inc.*, 414 P.3d 700, 703 (Colo. 2018) (quoting Colo. Rev. Stat. § 8-4-109(1)(a)) (ruling employees could seek previously unpaid overtime wages under the CWCA).

Graesser's offer letter stated that the "annual cash incentive plan," like other non-salary compensation programs, was "subject to applicable terms, conditions and eligibility requirements." Docket No. 54 at 3, ¶ 8. The letter also stated that her ability to participate in such plans "as may be available" was subject to "the plan administrator's discretion." *Id.* The terms and eligibility requirements of the AIP are set out in the AIP Rules Document. *Id.* at 4, ¶¶ 11-12. Although there is no evidence that Graesser received a copy of the AIP Rules Document, Docket No. 65 at 11, ¶ 2, her offer letter informed her of the existence of terms and conditions applicable to the AIP.

Graesser's arguments that she was not aware of the AIP Rules Document, that Antonelli was not aware of the document, that the document is unsigned, and that the document is not a binding contractual agreement all rest on the proposition that the terms of a bonus plan must be set forth in a bilateral contractual agreement in order for them to qualify the AIP bonus program as she understood it. Graesser relies on cases where an employee sought to enforce an employer's personnel policy or procedure as

---

*1-2 (D. Colo. Sept. 27, 2019) (company incentive compensation plan); *Hallmon v. Advance Auto Parts, Inc.*, 921 F. Supp. 2d 1110, 1120 (D. Colo. 2013) (inspecting a company document on bonus plans); *Cahey II*, 2021 WL 5384526 at *1-2 (company documents from an employer's website); *McFadden v. Pioneer Natural Resources USA, Inc.*, No. 04-cv-02595-WDM-PAC, 2007 WL 160990, at *1 & n.2 (D. Colo. Jan. 17, 2007) (verbal agreement); *see also Nieto v. Clark's Market, Inc.*, 488 P.3d 1140, 1142 (Colo. 2021) (analyzing a policy from a company handbook on vacation pay, another form of wages under the CWCA).

an implied contract against an employer. *See id.* (citing *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1165 (D. Colo. 2015) (evaluating whether a type of employee handbook created an implied contract); *ConcealFab Corp. v. Sabre Indus., Inc.*, No. 15-cv-01793-CMA-KLM, 2019 WL 3282966, at *22-23 (D. Colo. July 22, 2019) (determining whether an unexecuted employment agreement constituted an implied contract). Implied contract cases are distinguishable from this case because Graesser is not trying to enforce the AIP Rules Document against IQVIA as an implied contract. Instead, Graesser seeks to avoid application of a company-wide policy because its terms were not included in a contract. Graesser, however, cites no authority showing that a company-wide benefit policy must take the form of a contract to limit an employee's benefits. This case is therefore not analogous to the implied contract cases Graesser relies on; rather, it is like CWCA cases where an employer's policy is considered as part of the parties' employment agreement without examining whether it is part of a contract. *See, e.g.*, *Cahey v. Int'l Bus. Machines Corp.* (*Cahey I*), No. 20-cv-00781-NYW, 2020 WL 5203787, at *12 (D. Colo. Sept. 1, 2020) ("While the [incentive plan letter] is not an enforceable contract, it still constitutes some sort of agreement between the Parties—without it, there would be no basis for IBM to ever pay commissions, which it apparently does in its regular course of conduct.").[13] Based on

---

[13] In *Cahey II*, the court ruled that an employee could not create a dispute of material fact to defeat summary judgment on a CWCA claim by arguing, without any evidence or legal authority, that an employee policy did not apply to her. 2021 WL 5384526, at *9 & n.17. In her surreply, Graesser argues *Cahey II* is distinguishable from this case because it was undisputed that the provision at issue applied to the employee and because in *Cahey II* plaintiff provided no evidence she was exempt from a policy while Graesser "has cited to the record and to a myriad of state and federal cases" to show the AIP Rules Document was not the parties' entire agreement. Docket No 72-1 at 2-4.

her offer letter, Graesser knew terms and conditions applied to any bonus she may receive. The fact that Graesser did not actually read the terms and conditions does not prevent their application to her given that her offer letter alerted her to the common-sense fact that the details and rules of the bonus program were explained in a plan document. IQVIA has shown that it is undisputed the AIP Rules Document applied to an employee in Graesser's position.

Apart from the offer letter, Graesser says that her employment agreement with IQVIA included several oral promises IQVIA made to her. Docket No. 65 at 16. Specifically, Graesser argues that it is disputed whether her employment agreement with IQVIA included oral agreements between Graesser and other IQVIA employees. *Id.* at 2-3, 11, ¶¶ 7, 3. Graesser cites as a disputed fact that "IQVIA represented to Graesser that she would receive a bonus representing 15%-25% of her annual salary if/when: (1) she hit her personal performance goals for the year in question; (2) her division hit its goals for the year; and (3) IQVIA hit its goals for the year." *Id.* at 11, ¶ 3. IQVIA responds that "Plaintiff's personal opinion, *completely unsupported by any evidence* . . . does not create a dispute of fact." Docket No. 71 at 6, ¶ 3.

In support of her statement of disputed fact, Graesser cites several portions of her deposition testimony on the bonus structure at IQVIA. Docket No. 65 at 11, ¶ 3. Graesser testified that Gale Burns, a hiring manager for IQVIA, told Graesser about the bonus structure before she started working at IQVIA, Docket No. 65-4 at 7, 33:8-25;

---

Graesser presents no disputed facts that she was exempt from the terms of AIP Rules Document and so, like *Cahey II*, evidence that she was unaware of the document does not establish the document did not apply to her as an employee of IQVIA.

Graesser discussed the bonus structure with Burns "on several occasions," and Burns "gave [Graesser] vague answers," stating that "he didn't have access" to the bonus structure, *id.* at 64, 147:4-6; at the time Graesser was considering signing her offer letter, Burns told her that if three performance goals were satisfied that she would receive a bonus, *id.* at 66, 149:3-16; in regard to the bonus structure, Burns also said that "[n]obody really understands it[,] though," *id.* at 66-67, 149:23-150:1; the bonus structure as Graesser understood it was commonly discussed in team meetings by "the medical team" and "the client teams," *id.* at 65-66, 148:22-149:2; Antonelli gave Graesser the same explanation on the bonus structure around the first month of her employment. *Id.* at 66-67, 149:12-16, 150:15-21. In response to the question, "[d]id [Antonelli] specifically tell you that . . . you would receive an incentive plan payment each year as long as you were employed when the performance metrics for the previous year were calculated," Graesser responded "every year when we would discuss performance reviews, that was the discussion, is that performance reviews determine bonus." *Id.* at 68, 151:16-23. Graesser testified further that "I believe that the bonus is calculated, in part, upon performance reviews." *Id.* at 69, 152:7-9. None of Graesser's other citations to the record mention the three performance metrics she says determined whether she would receive a bonus. *See* Docket No. 65 at 11, ¶ 3 (citing Docket No. 65-5; Docket No. 65-7 at 6-9, 49:20-50:24, 64:10-65:16; Docket No. 65-9).

Although the CWCA recognizes that oral agreements can determine wages, *see* Colo. Rev. Stat. § 8-4-101(14)(a)(I), Graesser has not identified any facts that support her statement that the metrics she identified were part of an agreement she had with

13

IQVIA. Burns told Graesser that he did not have access to the bonus structure and that nobody really understood it, which statements limit the degree to which his comments about the performance criteria could be understood as IQVIA's policy. Antonelli explained the bonus structure in Graesser's onboarding. In conversations with Antonelli, Graesser testified he told her that performance reviews determine bonuses. Graesser's testimony, however, does not indicate that Antonelli told her when she would earn a bonus or what performance goals she needed to meet to receive one. *See* Docket No. 65-4 at 69, 152:7-9. Graesser's cited evidence does not support her assertion of disputed fact, namely, that she reached an agreement with IQVIA on the conditions required for her to earn a bonus. In other words, Graesser has not shown any disputed material facts supporting the existence of an oral agreement that IQVIA would provide her a bonus based on the metrics Graesser identifies.

### 2. Earned Wages

IQVIA argues that, under the standards set forward for AIPs in 2020 and under the terms of her offer letter, Graesser was not eligible for a bonus based on her performance. Docket No. 54 at 16. It is undisputed that Graesser's offer letter stated that non-salary compensation programs, such as the bonus program, were "subject to applicable terms, conditions and eligibility requirements," *id.* at 7, ¶ 21; Graesser was part of the CNS team, *id.* at 3, ¶ 6; the CNS team only deemed employees eligible for a bonus for the 2020 AIP year who received a rating of 3 or better,[14] *id.* at 7, ¶ 19; and

---

[14] In a footnote to her statement of disputed facts, Graesser states that "IQVIA paid bonuses to AMDs who received a 4 on their performance reviews." Docket No. 65 at 12, ¶ 11 n.5. In the exhibit Graesser cites, one employee in a different country labeled as an "Assoc Medical Safety Dir" was awarded a bonus and placed in a category of "4.

that Graesser received a rating of 4, which is worse.[15]  *Id.* at 12, ¶ 44.  Graesser does not identify any material disputed facts that demonstrate she was eligible for a bonus under the standard set by the CNS team for 2020.  In response to IQVIA's motion, Graesser argues that "[t]here is ample evidence upon which a reasonable juror could conclude that the Defendant's characterizations regarding the Plaintiff are not accurate" and that she earned her bonus, Docket No. 65 at 16, but she does not show she was eligible for a bonus under IQVIA's standards for her team.  IQVIA has shown it is undisputed that Graesser was not eligible for a bonus for the 2020 AIP year and therefore she had not earned a bonus at the time of her resignation in January 2021.  Because Graesser was not due any unpaid wages from the time of her resignation, her CWCA claim fails.  The Court will grant summary judgment on that claim.

### B.  Promissory Estoppel

IQVIA moves for summary judgment on Graesser's promissory estoppel claim. Docket No. 54 at 17-19.  Because IQVIA "does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element" of Graesser's promissory estoppel claim.  *Bausman*, 252 F.3d at 1115 (quotations omitted).  If IQVIA meets this burden Graesser can avoid summary judgment by demonstrating a genuine

---

Meets Some Expectations."  Docket No. 68 at 3.  However, the document does not state if the employee was on the CNS team and therefore does not support Graesser's assertion.

[15] Graesser argues, with no support, that her performance review was "altered by IQVIA on multiple occasions after Graesser resigned."  Docket No. 65 at 10, ¶ 44. Graesser testified that after she said she was resigning, in a meeting with Antonelli, he stated he felt that overall Graesser's "performance was exceeding expectations." Docket No. 65-4 at 74, 157:17-19.

factual issue on a material matter.  *Concrete Works of Colo., Inc.*, 36 F.3d at 1518.  Under Colorado law, the elements required for a promissory estoppel claim are "(1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that promise would induce action or forebearance by the promise; (3) the promisee in fact reasonably relied on the promise to his detriment; and (4) the promise must be enforced to prevent injustice."  *Peace v. Parascript Mgmt., Inc.*, 59 F. Supp. 3d 1020, 1029 (D. Colo. 2014).  In an employment context, "a promissory estoppel theory requires the employee to 'demonstrate that the employer should have reasonably expected the employee to consider the policy as a commitment from the employer.'"  *Geras v. Int'l Bus. Machs. Corp.*, 638 F.3d 1311, 1315 (quoting *Bullington v. United Airlines*, 186 F.3d 1301, 1322 (10th Cir. 1999) (applying Colorado law)).

   IQVIA argues that Graesser cannot show any dispute of material fact that IQVIA made a promise that is specific enough to support a claim of promissory estoppel.  Docket No. 54 at 18.  Graesser responds that she has shown that "IQVIA made promises to her regarding the compensation she would receive."  Docket No. 65 at 19.  In support of her claim, Graesser cites her conversations with Antonelli.  *Id.* at 2-3, 11-12, 19, ¶¶ 7, 6-9.  For the reasons discussed above, the Court finds Graesser has not shown any material disputed facts to support that Antonelli, or any other employee at IQVIA, promised her a bonus for her work in 2020.  Graesser's testimony provides no specific details on the performance metrics she claims Antonelli promised she could earn a bonus for meeting.  The Court agrees with IQVIA that Graesser has not shown evidence of a specific promise that she would receive a bonus for 2020.  Vague

descriptions of a bonus structure or policy are not sufficient to show "commitment from the employer," *Geras*, 638 F.3d at 1315 (citation omitted), to provide a bonus. "[T]he alleged promise must be sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Id.* (quotations and citation omitted). Graesser does not identify any disputed terms of the alleged statements that are sufficiently specific to constitute enforceable promises of IQVIA. IQVIA is entitled to summary judgment on Graesser's promissory estoppel claim.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's Unopposed Motion Seeking Leave to File Sur-reply [Docket No. 72] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 54] is **GRANTED**. It is further

**ORDERED** that plaintiff's Motion for Order Certifying Questions of Colorado law to the Supreme Court of Colorado [Docket No. 78] is **DENIED as moot**. It is further

**ORDERED** that this case is closed.

DATED September 12, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge